Good morning, and may it please the Court, my name is Steve Mishuda and I represent the Appellants Cntr for Biological Diversity. I'd like to reserve five minutes of my time for rebuttal. The question in this appeal is relatively straightforward. Counselor, remember you have to reserve your time yourself. Yes, thank you, Your Honor. Did the US Fish & Wildlife Service consider whether a population of coastal cutthroat trout in Washington and Oregon was threatened within a significant portion of its range? The Service violated this requirement with respect to two different pieces of geography in this case. First, the agency didn't evaluate whether the trout's decline in the lower Columbia River significant portion of its range required a listing. The Service failed to consider this area separately, even though its own scientist identified it as a significant portion of the range. Second, the Service failed to consider whether the marine areas used by this species of trout constitute a significant portion of the range. Now, these areas are large. They're up to 15 percent or more of the trout's habitat, and they're vital to the health of the species. These meaning each of them? Pardon me, Your Honor? You're saying these meaning each of them, each different? These, the marine areas themselves. Turning to my first point. Is it correct that the agency has noted that the lower Columbia River is a significant part of the range, but not with regard to the marine areas? That is correct, yes. And that's a critical fact here that I wanted to start with. There isn't any dispute in the record or among the parties in this appeal that the agency did identify the lower Columbia River as a significant portion of the range. In fact, the expert biological review team and the agency's own scientists both concluded that it was a significant portion of the range, and that a threatened status within that range would justify a listing. Well, in terms of the lower Columbia River, it looks like they did do some analysis of that, and what's troubling or maybe needs to be pointed at is they seem to say, okay, the Andromedas form might have some trouble in the river. But overall, the non-Andromedas forms are down there too, and overall, not overall in the whole world, but overall in the lower Columbia River, it is not threatened. The whole thing isn't threatened. The whole DPS isn't threatened. Andromedas form might have some threat. It might be too low. But basically, Andromedas form is not a separate segment. It is all one DPS. So how do we deal with that when they actually did do some analysis and they did say that was the case? Well, they're ignoring it, and it doesn't look like they are. Right. Well, Your Honor, when I say that they ignore it, I should clarify. They identified this area as a significant portion of the range, and then what they didn't do after that was apply the ESA's five listing factors in Section 4A to that significant portion, an analysis of population trends across the entire DPS. No, no, no. I'm talking about they specifically say that in that portion of the range, I know about the overall thing. They do make that overall. But they say in that portion of the range, the population trends are just fine if you count all three forms. Well, I think they did say that the population of an Andromedas is declining. You're correct about that. But I think when they turned to look at the freshwater forms, they also said that they lack data on population trends for the freshwater forms. And I think just looking at the lower Columbia River, what we have is a lot of evidence of a decline for the anadromous form. What we don't have is a lot of evidence that the freshwater forms, even in that specific portion of the range, are doing fine. We may not have a lot of evidence, but now you're getting us into the evidentiary, we can argue about their science. But they do specifically say that the freshwater forms remain well distributed and at reasonable densities in the lower Columbia River. That's what they said. Well, and they also said, this is on page 37 of our excerpt of records, that there's little information on population trends for resonant or freshwater forms. Overall, and this is sort of a theme that runs overall, what the agency has done is to say, if we don't have the information, then we're not listing. That's a reason for not listing, right? That is one of the reasons. You're not taking that on directly. In other words, this is no different than most of what they're saying. Because a lot of what they end up saying is, we don't know, and because we don't know, we're not going to list it. I think with respect to this, again, this question of the lower Columbia River, I think there's two things to keep in mind. Yes, there's trend information. It's more clear for some than others. But really what the agency is required to do under the significant portion of the range analysis in the ESA is to apply the five listing factors. The five listing factors are about a lot more than just trends. Trends tell you something for sure, but what they don't tell you are threats, all the other disease, commercial use, other man-made and natural factors, over-utilization for commercial purposes. All of these factors are captured in the five-factor analysis that the ESA requires and this Court's rulings require, and even the solicitor's opinion that we submitted last month require the agency to apply those five listing factors. And trends is definitely a part of that, but I think if we focus only on trends, we lose the rest of the five-factor analysis that the agency is supposed to apply. That's the solicitor's opinion. Is it just a lawyer's opinion to a client who hasn't adopted it? I think it does two things. One, I think it affirms this Court's holding in Defenders that a significant portion of the range is in analysis. We usually think that we affirm them. They don't affirm us. I don't mean in the Presidential Center, Honor. I just mean I think it adds a second from the solicitor's office. Well, I understand that, but it's not an operative document that has been adopted by you. Yeah, we're not claiming that there's a cause of action against you. No, I was just trying to understand what it is. But I do think it's important and persuasive here because we have the solicitor rendering an opinion and then Fish and Wildlife Service taking a very contrary position in this appeal. And that's why we submitted that. Well, what contrary position? You mean because they didn't actually set out the five factors? Right, and they didn't do a five-factor listing analysis for the lower Columbia River. I don't think that latter fact is in this case. I guess the question is, is that formulaic? I mean, suppose we were to say, yes, you have to do that. Won't they just take this document they've already produced, cut and paste it in about a week, and turn it back to us or to you? I would hope not, Your Honor. That is certainly one possibility. I think with many of these cases, we are always on the side of hope and would expect that. But this is a little different because they did address pieces of this strewn around in this document. I mean, it isn't really a question of not having done the work. It's more a question of not having organized it in a particular way. I think that may be true with respect to trends, Your Honor, again, which is what we've really focused on so far this morning is that they've got trend information. But what we don't have are separate analysis of the threats that face these species in this area, again. And I think if you apply those factors, I don't think that in order to get a remand to the Fish and Wildlife Service in this case, it doesn't have to be the case that they will list if they find one of these factors. But the fact that they haven't done that analysis is important here. And we think if we send this back to the agency and they apply the five listing factors, there's at least a pretty good chance, based on the information that's in the record now, that the lower Columbia River significant portion of the range is a threatened, qualifies as threatened. How about estuaries? You insist that the estuaries are a significant portion of the range. Now, they had agreed to lower Columbia River. I don't see that they agreed to the estuaries. Correct. We know that significant portion doesn't key on size and volume. And I guess it might depend in part on the necessity for the survival of the distinct group as a whole. What are you pointing to that requires them to consider the estuaries a significant portion of the range? Because this whole thing falls apart if the estuaries alone are not a, quote, significant portion of the range for the whole DPS. I'm not talking about the Andromedas. You know, I think so that is my second major point this morning. The marine areas, which is a little bit different than the lower Columbia, because they did not consider or ask the question whether the estuaries and the marine habitat were a significant portion of the range. We believe that there's two things that go to. Just to be clear, what do you mean by marine area? Do you mean the ocean itself? Yes, the estuaries and the portion of the near shore ocean areas that these fish inhabit, which is, you know, anywhere from 6 to 45 miles offshore. And presumably there's a significant overlap with the lower Columbia River, but it's a broader and narrower area. Correct, yes. There are actually three major estuary systems for this population, the lower Columbia River, Willapa Bay, and Grays Harbor, both on the Washington coast. And so there is some overlap between the marine area issue and the lower Columbia River, but it's not perfect. But to answer your question, Your Honor, I think there are two different factors. One is size. I think geography is, while not determinative by any sense, is important. These areas are large. They're very important. Large compared to what? Well, they're large, I think, even if you compare them to the range of the DPS as a whole. I think we saw in Fish and Wildlife Service's response to our supplemental authority a figure that, you know, the estuaries are only 2.4 percent of the range. Well, that doesn't include the ocean areas. And it also doesn't, it kind of compares apples and oranges. We're looking at water habitat in the estuary versus land mass for the entire DPS, a 14,000 square mile land mass. Obviously fish don't inhabit every inch of that. They weren't measuring the acreage and the river. Right, right. It's land mass versus water. And you, on the other hand, say that the percentage of the area. The percentage, and I think this is on pages 23 to 24 of our opening brief, is where I get these numbers, very back of the envelope, at least 15 percent and likely greater if you were considering and comparing water to water. If it's 15 percent of the range, so what? Well, and then that gets to the second factor, which is that these marine areas are very biologically important to the DPS. They're biologically important because they allow connectivity between otherwise isolated freshwater populations. They allow the anadromous form to recolonize lost habitat over time. Let me see if I can explain my understanding and ask a question. Obviously we're dealing with concepts that are not that familiar to me, probably more familiar to you. But do we say andronomous forms or anadromous forms? How do you say it? Anadromous. Anadromous, okay. So those forms obviously need the marine and estuary areas. And there is some science, I gather, that says that the lifestyle diversity or the life strategy diversity is at least hypothetically important in the long run. But the statute deals in a certain – doesn't deal in the long, long run, right? It deals in the foreseeable future, whatever that is. And there's some discussion somewhere of maybe it's 50 years, maybe it's 100 years, maybe it's a lifetime. But it's not forever. Right. And so if what you're saying is – if you can't meet that standard with regard to the marine and estuary areas and the need for the anadromous forms, are you really saying that you're looking at a longer scale than the statutory scale? And you're saying that's what makes it significant that although it's not going – it's not going – anadromous forms are not essential to survival in the statutory period. They are at least hypothetically significant in a longer period. I think there's – there is disagreement in the record about what foreseeable future means. And I think if you look at the BRT's findings, many of which I think we block quoted in our opening brief, but if you look at those findings, they're concerned with long-term. What they don't do, unfortunately, is say what they're talking about, whether it's 20 years, 50 years, 100 years. But, again, the conclusion that the BRT came to is that you need in the long run for viability, which is a long-term forward-looking inquiry, you need to have the anadromous life history. You cannot have the anadromous life history unless you have the habitat and the range that supports that life history. And that's the marine areas. There is – you know, there is a dispute running in footnotes largely in our briefs about whether or not the resident fish can someday rescue the anadromous fish. I don't think that that's – Well, they can't rescue them unless they can get to the marine area. Right. And unless the marine areas can support them once they get there. Right. And that's what's important. It seems like largely a red herring in the sense of if these areas are going down, it doesn't matter whether they can produce these individuals. That's absolutely correct. They're not going to do any good. Right. That's absolutely correct. So I don't think that the significant portion of the range inquiry requires a look beyond foreseeable future necessarily, especially when you're asking is this range significant. I think there's enough evidence in the record that shows that the range is necessary and is significant if the only question is whether or not it's significant. Within the statutory period? Well, I was going to say if the only question is whether it's significant in the statutory period, that's a question that Fish and Wildlife Service didn't ask. The BRT didn't, unfortunately, address it head on. The BRT was looking at a 100-year time frame in some of its inquiries, and I think that's within the statutory time period. But I don't necessarily believe that we have to determine what the foreseeable future is in order for Fish and Wildlife Service to have even asked this question about the marine areas. Wait, I didn't quite get that. Anonymous, they don't have to ask. Let's say that form was very, very, very low in the estuaries. Why does that make the estuaries a significant portion of the range? Well, I would separate the decline from the habitat for a moment because I think significant portion of the range focuses on the estuaries. So I think even if this were, we wouldn't have brought this case if it were the case that fish were doing fine in the estuaries. But if they were, Fish and Wildlife Service would still have to have asked, are the estuaries a significant portion of the range? They don't, it's not a question that's triggered on the declines. Well, what's the trigger of the question? I mean, this is the problem. And this was somewhat addressed in the Defenders case, but not to any great resolution. Suppose you were to come in tomorrow and say, oh, but they didn't look at this particular stream as a significant part of the range. What is the trigger for the obligation to even consider whether it's significant? I think obviously the trigger, as in Defenders, is going to be different for every species. But here what we've got is a record that says the marine areas are important to the species. They fulfill a very important role for the species. If there wasn't record evidence about that in this case, we wouldn't have brought this claim. I think the worry that we could slice and dice any range into various significant portions is one that isn't borne out necessarily by the science. If the science shows that we've got a significant area, then the agency has to consider that as a significant, it has to ask whether that's a significant portion. So do you have to prove that it's significant in order to make them consider whether it's significant? What do you have to demonstrate in order to place an obligation on the agency? If there were, if there were, I would perhaps flip that. If there were a reasoned explanation by the agency that this area was not significant. No, but I'm asking what is the trigger for their obligation to even explain that? I think if there's evidence in the record that you have an area that is, and this is unfortunately a bit amorphous, if you have an area that's large and it's important biologically to the species, they should at least be asking the question. We're not saying they have to answer it in the affirmative, but they have to at least ask the question. And here we've got that evidence in the record, and they haven't asked that question. We're not asking that the court find that this marine area is significant. What we're asking is that the court tell the Fish and Wildlife Service that they have to consider that question. One last question, and we'll give you a little extra time. But does it matter at all that even the fish that use this area don't live there permanently? In other words, it's a kind of strange business to talk about them being extinct in a significant part of the range when they don't, when they're only there some of the time and don't apparently need to be there. The particular fish don't need to be there, right? Right. I think that's not, I don't think that that's necessarily, well, I don't want to call it a red herring, Your Honor, but I do believe just because they're not there all the time doesn't mean that the area is not significant.  But then they have to be extinct in a significant part of their range. And is it a sensible concept to say that these fish are extinct there when they don't even actually live there? Well, if they were extinct there, they wouldn't be even living there for the few months a year that they do. But I think, again, going back to the defender's decision, viability is the question. Trying to ask whether something's extinct in a significant portion of its range isn't going to tell you whether it's threatened because if it's gone, it's already extinct. I understand that. So what you're looking at is viability, which is an inquiry into the long-term health of the population. And so if you're looking at viability in a significant portion of the range, that's what you would focus on in the marine areas. Okay. Thank you. Thank you, Your Honor. Good morning, Your Honors. And may it please the Court, Alice Thurston on behalf of the Fish and Wildlife Service. With me at council table on the far side is Damien Schiff of the Pacific Legal Foundation, who will be speaking for three of my 20 minutes. And I'll try to keep track of that time. Interveners. I agree there are two questions remaining in this case. Plaintiff petitioners have dropped the question of whether or not the Fish and Wildlife Service has relied on the best available information. So you have before you a record which is, in fact, full of the information that the agency has before it. I'd like to go straight to the question of the marine area and marine degradation. Let's do the other one first, if you don't mind. Lower Columbia River? Yeah. I gather it's common ground that the agency has, in fact, recognized that area as a significant area. I don't want to quibble on this, but to be precise, the scientists thought it was a significant portion of the river. The withdrawal notice does not state that, but I'm correct to concede, and I did in my brief, that it's a significant portion of the river. Okay. So then we have a very kind of technical question, which is whether there was an obligation to set out that part of the range and discuss the five factors with regard to it, and that wasn't done. I think that what you'll find throughout the record, and both in the withdrawal notice and in the- The question's not the record. The question is the explanation. I'm including the explanation in the withdrawal notice. You will find a five-factor analysis, and within each of the five factors you will find discussion of the Columbia River, the Lower Columbia River specifically. And I cite you to all my cites on page 48 of my brief, which go through the various analyses. 36 through 37, population trends in the Columbia River and tributaries. 37, analyzing and distinguishing Lower Columbia River and Washington portion of the DPS. What I think the agency did in this instance, when it was asked to list, it was asked to list only the sea run portion of this DPS, and what it did was it did an analysis that was a comparative analysis among the three rivers and didn't, in fact, ignore any aspect of the Lower Columbia River, but it did it by comparing it in other ways so that what I think you said earlier, Judge Berzon, is, in fact, correct. We're asking for a different formatting of the analysis of the Lower Columbia River, taking it out from a comparative analysis that includes, in fair detail, a good assessment of the Lower Columbia River and its impact. I think that the evidence has grown stronger since the case. That's not in the record, but I think that your point about on remand, wouldn't it be reformulating, and it might well be that. I don't want to prejudge it, but there is, I think, a lot of evidence as specifically to the Lower Columbia River going forward. I'd also like to point out that this was a – the findings as to the Lower Columbia River as expressed by Dr. Campton, who was a member of both the NIMS and the Fish and Wildlife Service teams, were supported by the other biologists. Raleigh Wilson and Doug Young both spoke of the fact that they didn't feel that there was a significant threat to the fish in the Lower Columbia River. And the district court's decision is particularly good in this regard, in reviewing the in-depth record evidence on what the scientists had to say about the species. Is there more on the Lower Columbia River? May I move to the marine area? I'm sorry? May I move to the marine area? The claim that plaintiffs have made is that there wasn't a real analysis of the marine area, but I cite the Court to Excerpts of Record 34, where the agency specifically discussed estuary degradation as a complete subset of the withdrawal notice. Now, just to focus on the two aspects of the significance of the marine area, as a biological matter, you have a life form of this fish, which uses the marine areas for three months out of their lives. They can spend years not using the marine area. The marine area is not essential to any of their life requirements, including reproduction. That's all. It's sort of the reverse of many salmon, who use streams only to breed and lay eggs and then die, but spend three or four years out at ocean. In fact, here you have fish who, even in the anadromous form, spend most of their lives not in the marine area. It's a three-month period. What I don't understand about your brief, and to some degree about the withdrawal notice, is you put enormous emphasis on the fact that the non-migratory or freshwater forms can generate the sea run life strategies, or whatever we're calling them. But that doesn't make any difference if they can't actually get to the sea, or if there's no sea for them, or the sea is not- I know you called that a red herring, but I think it's in fact not insignificant. We are talking foreseeable future. Let's say there was an oil slick that was damaging to the estuaries and prevented any anadromous fish from getting to the sea. That might be a chance- But that's essentially what's being said. What's being said now is that the habitat is at least arguably so inhospitable that even if they cannot fulfill the function for the DPS that they're supposed to fill. And you're saying, well, that doesn't matter because even if all those fish don't make it, some of the other fish can generate little fish that can do the same thing, but they won't be able to do the same thing. Let me separate out two points. The first is we do not agree that it's currently that bad, and I have many sites here, especially on page 45 and 46 of the record, where the agency specifically found that the estuary area is not in danger so that I think plaintiff's strongest argument in this regard is that anadromous portions serve as a genetic reserve for repopulating a stream if it were wiped out. But my point is that if there's a slick or some temporary foreseeable action as opposed to an earthquake that was not necessarily foreseeable, then you could in fact have repopulation from above the streams. And if you look on page 34 of the excerpts of record, which is the withdrawal notice, they even are discussing the fact that there were 10 generations of fish above a dam reproducing anadromous fish. I don't want to overstate the importance of this because I think you're right that the condition also of the estuary areas is important, but I think that the record amply shows. But doesn't your ultimate argument have to be, or at least one strain of it is it doesn't matter even if no fish ever gets to the sea again, that as long as they're happy and fecund in the freshwater areas, that's okay? No, I don't go that far. My argument is that the agency found as a factual matter based on substantial evidence in the record that there isn't that kind of damage to the estuary areas. And what I'm saying with respect to the ability to reproduce is that there are genetic reserves that aren't in the estuary areas. And the findings, let me just say, the current condition, limited likelihood of continued degradation or loss of estuary habitat and remaining populations of Throatletus to conclude that the estuary conditions are not likely to result in the DPS becoming endangered in the foreseeable future. Let me ask you a different question. I'm trying to understand. I think Judge Berzon was going in this direction. If I understand what the agency is saying in general, is that we're talking about a particular distinct population segment. The anadromous form is just a part of that. The question is whether the DPS itself is threatened or endangered. Suppose the anadromous form barely hung on or barely existed. Does that mean that the DPS itself is threatened? Or does it just mean, well, maybe a piece of it will fall off or won't be represented very well, but that doesn't matter. I'm trying to understand what they're really saying. If we're going to key on each one of the forms, and it sounds like we've got three different DPSs. You have an extremely plastic fish. You can have forms that switch back and forth. I do not believe that if the anadromous life strategy were threatened, that the DPS in its entirety would be. Remember, this is a DPS that occupies its entire historic range. It's a robust DPS. Plankton's claim is that it's the marine area form, the anadromous form, that is threatened by development at the estuaries or logging or whatever. There is no disease, by the way, and there is no commercial use of this fish. So the claim that the fish in the anadromous area are threatened is belied by the agency's findings that that area is, in fact, not as severely threatened as the BRT team thought it was. First of all. Does that matter if it's not a significant portion of the range? It is not as biologically significant as plaintiffs are claiming, and it is not as threatened as a physical matter in that area. But the second is really not particularly relevant to our current inquiry because our current inquiry, as I understand it, is, and I was asking this question before, at whatever threshold the agency is responsible for as to whether to make a separate inquiry into significant, whether it's extinct in a significant part of the range, is this a significant part of the range, that whether it's extinct in that area or threatened to be or threatened or endangered is what the agency would have to inquire into if it was responsible to inquire into it. Right? In other words, their claim is you didn't do something. What you didn't do was make an inquiry into whether it is threatened or endangered. So whether it is threatened or endangered isn't really our problem at this point. That's the five-factor analysis. But this gets back to your argument at Absurdum. If you have a portion that they claim is significant for some reason, let's say it's above a dam on one tributary, and there's many dams and many tributaries, what makes that significant? And part of what makes it significant is whether it's, in fact, possibly not viable in that area. This is the test that comes from the defender's case. We're trying to find out where it is that you start looking at an area that's significant and see if it's something that merits greater scrutiny by applying the five-factor test. In this case, the agency looked at the evidence. They found that the NIMFS team had relied on angler data that wasn't particularly convincing as to the declines. Can I ask you about that? Yeah. What I understood that to be saying is the reason the angler data wasn't useful anymore is because people weren't fishing there anymore. And it occurred to me the reason people weren't fishing there anymore is because there were no fish. I believe it's catch limits, as I recall. I don't think it's necessarily that they're not fishing there. And I believe it depends a lot. You'll see this written up in the actual written explanation. It says, you know, it depends on the skill of the fisherman or fisherwoman. It's not just a question of angler data being – but in point of fact, there has to be data to list the species, too. There's got to be a biological grounding for making a listing determination. And the Fish and Wildlife Service came – after the BRT had finished its analysis, the Washington Department of Fish and Wildlife provided new information historically that was showing that there wasn't the rate of decline. The BRT had assumed – And this is information based upon the diary of a single individual. I'm sorry, I didn't hear you. This information, this new data, is this the data that was supplied from the diary of a single individual? There was one individual who had it, but that's not the entirety of what the Fish and Wildlife did. All right. I want to take you back to something. It was track data. That you started on earlier when you began discussing the marine areas and the estuaries. And you began talking about the short periods of time during the year that the anadromous species was utilizing the marine areas. Were you attempting to say that these areas are not significant, that the marine and estuaries are not a significant portion of the range? We have said that the lower Columbia River as a whole – Forget that. No, because it encompasses the marine areas, so there is an encompassing of the estuary areas that is part of the significant portion of the range that the scientists found. But as to whether or not those areas by themselves, the estuary, the saline areas, if you will, are significant, the agency looked at estuary degradation and looked at the fish's ability to move back and forth between the areas and looked at the amount of degradation and decided that it was not a significant area, a significant portion of the range. Are you saying that when you say lower Columbia River or when the agency says it, it is encompassing all of the areas that your opponents are calling estuary in? Yes, it encompasses the estuary areas, and I think it goes up to the Sandy River past Portland. Because they seem to say a little while ago that it encompasses more than just the lower Columbia River. It goes further. That's not true. What encompasses more? The estuary. When they say estuary, they're not just talking about the lower Columbia River. I believe the lower Columbia River is, in fact, the larger category and that marine and estuary areas are a subcategory of that. So these are all within what you call lower Columbia River. Yes, I believe so. That's not my understanding. I didn't gather that was the case. I'm sorry. That's true. The other two, there are two other. Okay. I had forgotten about them. There are the two other rivers that are not part of the lower Columbia River, yes. Okay. I was focusing on the marine areas outside of the lower Columbia River. Excuse me for adding to the confusion. And I guess that then explains why the agency didn't feel it necessary to apply that five-factor test to the estuary and the coastal marine areas. Well, because it was not a significant portion of the range, it was not the five-factor test was not necessarily. I understand that this is a very strange statute because you have all these overlapping concepts. You have the significant part of the range and you have the DPS and so on. But if the agency thought it wasn't a significant part of the range, then all it needed to say was that it wasn't a significant part of the range, and why not? But it didn't do that, and that is what I understand the objection to be. You're now telling us that it decided that it wasn't a significant part of the range, but is there any place in the document that it decided that? As a formal statement, the marine areas are not a significant portion of the range. It's not in the record. The analysis is there. Part of it was that what we were – is a historic artifact from the petition to list was that we were asked to list the sea-run species. So we were looking at the species from that perspective and not from the perspective of breaking down the geography of the entire DPS. But there's pretty much a complete overlap between the question of whether the sea-run species group should be listed and the marine and estuary areas as a significant area. I mean, in fact, you didn't list the sea-run area or even proposed to list it separately, and that's why all the confusion has ensued. I'm not saying you should have, but, I mean, that's – it's the group that you actually dealt with didn't have the overlap, but the group you were asked to list did have the overlap. I believe that the listing was for more than just the sea-run area. That's what I'm saying. Yeah. Therefore, you didn't answer the question of whether the marine and estuary areas were a significant area by answering the larger question of whether the whole larger group should be delisted. In other words, yes, you said it was a historical artifact. Yes. And if you had originally proposed to list the sea-run fish and then had determined to delist or not to list the sea-run fish, then what you're saying might well be true because there'd be a complete overlap between the group you were being asked to deal with and the geographical area you were being asked to deal with. But that isn't what you did. You dealt with a larger group in a larger geographical area. No, but the – that's true, but the point of analysis was seeing where the sea-run fish are distinct from the other fish, and they're not. They're this continuum of fish that – So it has to be your ultimate position, and I understand it to be your ultimate position, that it wouldn't matter if the sea-run fish simply didn't exist. No, I don't think that that can be our ultimate position in the sense that this is a subspecies that is genetically identical between Northern California and Alaska. I mean, it's got a huge range of subspecies. I know, but this DPS didn't exist. But if this DPS didn't exist – Not that the DPS didn't exist, but the sea-run life strategy in this DPS didn't exist. Yeah. As a theoretical matter, if it didn't exist for a time in the foreseeable future, and that's the oil slick example that could be cleaned up, the freshwater fish – and I do think the record strongly supports this because on page 34 it talks about how brown trout and other salmonids can do this – could replenish the estuary area within that. Maybe I am misunderstanding, but my understanding of the request that you consider the significance of the marine estuaries area is precisely because absent some listing, there's no reason to think they are going to be cleaned up. There's no what? No reason to think they are going to be cleaned up. The whole reason for putting some area on a threatened or endangered list is so that there will be some attention paid to cleaning it up. But the agencies found that that area was not sufficiently endangered to think that there was going to be an absence of these fish in the foreseeable future. That's on page 44 and 45 of the agency's decision. Let me read to you again what I said. I mean, here's the sentence beginning, given our current regulations, we do not anticipate additional large-scale loss or conversion of estuary or off-channel areas. While past losses of estuaries may have contributed to reduction in the anadromous portion of the coastal cutthroat trout population over historic areas, we do not have evidence that past and future losses are likely to result in the DPS becoming endangered in the foreseeable future. That's specifically talking about losses of the anadromous portion. No, it isn't, actually. That's the problem. No, it isn't. Because it's not likely to result in the DPS of coastal cutthroat trout becoming endangered in the foreseeable future. Well, I think that what they're talking about is the endanger to the estuary areas where the anadromous fish are living. And I am using up my co-counsel's time. Okay. But I really think that the lack of foreseeable loss of the anadromous portion of the fish is critical to the fact that the agency did not think that it was a significant area. Ms. Thurston, one last question. What's the downside of listing the species as endangered or threatened? What's the downside? It has no commercial application. The downside, you know, far be it from me to speculate about this. I guess I don't have it in the record before me. I don't know that the – I've got an intervener who's ready and willing to speak exactly to that point. I don't know is a satisfactory answer. Okay. Thank you very much. Thank you. Counsel, I'll give you a few minutes, say three. Thank you, Your Honors. Damien Schiff for the defendant intervener appellees. I've been in a somewhat happy position today of offering Your Honors a very simple way of disposing of this case. Which nobody agrees with, including the agency. Well, that's true. But I shall press on evaluating nonetheless because we do believe, Your Honors, that the statute is clear. The statute says that the service may list species, subspecies, and distinct population segments of species. All right. I honestly do not understand your argument. Because if you gave a sixth grader a Venn diagram, they could demonstrate that a smaller entity is part of a larger entity. So, therefore, if you have a distinct population segment of a subspecies, it is a distinct population species of the species. And what's the problem with that? The problem is, Your Honor, that the service does not define distinct population segment as simply a subset of some larger taxonomic category. The DPS policy that the service uses defines a DPS with reference to a specific taxonomic level above the population, meaning that a population must be both distinct and significant with reference to a higher level of taxonomy. And it is not true that something that is distinct and significant with respect to its subspecies is necessarily distinct and significant with respect to the overarching species. But did you raise this issue before the agency? No, Your Honor. This was not raised before the agency. But we believe that the proposition is well established, that this Court can affirm the decision of the agency on a purely legal ground if it does involve the interpretation of the agency's authority under the enabling statute. Here, the contention is that the Endangered Species Act simply does not afford the service. What about the whole Vermont Yankee line of cases? I'm sorry, Your Honor? What about the whole Vermont Yankee line of cases suggesting that issues do have to be raised before the agency first? Your Honor, I'm not familiar with that line of cases, but I can offer, for example, in the Railway Labor Executive Association's case, 784 F. Second 959, where this Court expressly addressed the contention raised by defendant-intervenor appellees as to the statutory authority of the government agency they are at issue. And we believe that this is an appropriate opportunity with which to raise the question. Since my time is limited, Your Honors, I would just like to raise one additional point, which is the original version of the Endangered Species Act gave the services the authority to list DPSs of subspecies. The language said that species includes any subspecies of fish or wildlife or plants and any other group of fish or wildlife of the same species or smaller taxa. That clearly is an authorization to the services to list groups of smaller taxa, meaning groups of subspecies. But that language, Your Honors, or smaller taxa, was removed from the statute in the 1978 amendments and replaced with simply the phrase of species, of any species. And we think, therefore, the statutory history is loud and clear that the Congress determined that that was not a permissible listable entity for purposes of the Endangered Species Act. Thank you, counsel. Thank you, Your Honors. Thank you, Your Honors. I have one, perhaps, quick point to raise about Intervenor's arguments. Not only was it not raised before the agency, it wasn't raised properly even before the district court. This argument appeared for the first time in their reply brief in the district court, and the district court was right to ignore it in its decision, and I think this is a very important point. This court is well justified in not addressing it here. I want to, and we'll rely on our briefs, I think, for the counter arguments to that. I want to just hit on a couple of points very quickly. We had a lot of discussion about the marine areas, the estuary, and whether or not the DPS was not endangered encapsulates findings specific to those areas. All of the conclusions in this listing notice are based on the range-wide analysis. Every time we have a discussion of estuary degradation or anything that's specific to either the marine areas or the lower Columbia River, the service then broadens its focus and says, well, it doesn't matter because the DPS as a whole isn't threatened. And that's what we hear today from counsel, was an assertion again that none of this matters because the agency already concluded that the DPS as a whole isn't threatened. But I think there is some language in the withdrawal notice stating that essentially the degradation of the marine estuary areas has lessened or stopped and that, in fact, in some areas it's improving. Now, I'm not sure that's relevant, again, to the significance question, but it is there. Yes, and I don't believe it's relevant to whether or not the marine areas are a significant portion of the range. I think they would ask that if they found the marine areas significant and were doing an analysis and there would be, I would imagine, a more thorough inquiry into whether or not those conclusions were correct. But it doesn't matter for the question of whether or not the area is significant. That answers the question of whether or not it's degraded enough or the threats are great enough to list. We went through this before. But as to the Lower Columbia, it just isn't true that they always go to the overall species as a whole in the whole area. In the Lower Columbia, they specifically said that the species as a whole is fine in the Lower Columbia, not in the whole range. But in the Lower Columbia, the species as a whole is fine. They specifically do say that. Well, they do, Your Honor, and, again, I would, if we're focusing on trends, I think You want to cover the five factors again. Right, right. No, I know. And I just want to emphasize the point that we're not just talking about a numbers game here. There's more than trends at stake. And I would also point out Well, what else is there at stake specifically? I mean, two of the factors don't seem to apply at all. So then what else is there? Let's say if we thought trends was okay, there's no commercial use, there's no predators, I gather. What else is there? Well, there probably is a problem with predators, but we won't get into that. I think if they're going to apply all the five factors, I think we would be looking at curtailment of the range in particular, degradation of habitat in particular. What I want to say, though, with respect to the Lower Columbia River is the agency did say trends were still declining in the Lower Columbia River, that we have populations lower than historic levels. That's all cited in our reply brief. I think it's pages 6 to 9 or somewhere thereabouts. Where we tried to address point by point the agency's assertions for the Lower Columbia River that they considered it. And I think every single one of those, again, falls prey to this DPS as a whole analysis at the end of the day. Really, the listing itself is based on the DPS as a whole. And it doesn't consider the significant portion of the range. Thank you very much, counsel. Thanks. Thank you, counsel, for useful arguments in a difficult case. And the case of Center for Biological Diversity versus U.S. Fish and Wildlife Services is submitted. We will go on to Coos County Board of County Commissioners versus Kempthorne.
judges: Fernandez, Berzon, Wright